UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RICKY FRANKLIN,

                Petitioner,                          Case Number 09-13466
                                                         Honorable David M. Lawson

v.

JEFF WOODS,

                Respondent.

_____/

## OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

In 1995, a jury in the Oakland County, Michigan circuit court convicted petitioner Ricky Franklin of conspiracy to possess with intent to deliver 650 or more grams of cocaine. At the time, the conviction called for a mandatory life sentence without parole, although legislative changes have made the petitioner eligible for parole. Following his unsuccessful direct appeals and post-conviction motion litigation in state court, Franklin filed the present petition for a writ of habeas corpus under 28 U.S.C. § 2254. He raises a variety of issues, some of which the respondent contends cannot be reviewed because of the procedural default rules, and all of which he says lack merit. The Court has assessed the merits of the petitioner's claims and concludes that none warrant habeas relief. Therefore, the petition will be denied.

I.

One of the petitioner's challenges in this case is to the sufficiency of the evidence against him. Consequently, the Court will discuss the record in some detail.

According to the trial court record, the petitioner was involved in an extensive cocaine trafficking operation that conducted business between Muskegon and Oakland County, Michigan. It came to light on July 5, 1990, when Sergeant Paul Bourlier of the Southfield Police Department

made a traffic stop of a vehicle driven by Marcus Holloway, a/k/a Martese Wideman.  The petitioner and Gerald Hill were passengers in the car.  While Sergeant Bourlier spoke with Wideman, Hill and the petitioner were permitted to go to a nearby party store to purchase a drink.  After going into the store, the petitioner returned to the car but Hill walked across the street to a nearby auto parts store, carrying a package.  Bourlier ended the traffic stop and went over to the auto parts store.  Another police officer, Sergeant John Fisher, was flagged down by a worker at the auto parts store, Kevin Ali, who had seen Hill go to the back of the store with a jacket wrapped around his arm.  Ali later went to the back of the store and found a jacket lying on the ground.  Ali pointed out the jacket to Sergeant Fisher, who discovered that it contained two baggies containing 389.64 grams of cocaine. Hill was subsequently arrested.

On August 28, 1990, the Muskegon police executed a search warrant at the Roosevelt Park Plaza Motel, where they found money, cellular telephones, and beepers.  Outside the motel room, the police found an automobile containing 54 grams of cocaine.  The police arrested Dwayne Wynn.

About eight months earlier, on December 11, 1989, police from the Muskegon County Sheriff's Department and the Muskegon Heights Police Department stopped a white Mercury Cougar containing Cato Peterson, Amir Wilson, Aaron Banks, and Ronald Gardner, Jr.  Inside the passenger side door, police recovered a screwdriver.  The police also found a hot plate in the trunk of the car.  When the police opened the trunk of the car, they discovered 23 baggies containing 222.052 grams of cocaine.  A latent fingerprint taken from the inside rim of the hot plate came from the petitioner's little left finger and a print of the plastic baggie containing the cocaine was made by the petitioner's left palm.

-2-

Ronald Gardner, Jr. testified that he grew up in the same neighborhood with the petitioner. On the morning of December 11, 1989, the petitioner called him from Wideman's house and asked him to follow him to Amir Wilson's house. Wilson and Peterson got into Gardner's car and the three men followed the petitioner to a K-Mart store, where they purchased a hot plate and a screwdriver. The petitioner informed the other men that he was going to put the "stuff" into the hot plate. The petitioner and Banks placed the cocaine inside the hot plate and then reassembled it before placing it in the trunk of the car.

Gardner knew that he was going to Muskegon because he had been there twice before. In October of 1989, Gardner had taken Banks and a man named "Twin" to Muskegon. Sam, Jeremiah, and Gerald Hill had driven in another car. Gardner testified that he knew that the men would be selling cocaine in Muskegon because earlier he had gone with the petitioner to Kevin Smith's (a/k/a/ Kevin Jackson a/k/a Fat Kev) house to pick it up. Gardner followed Jackson and the petitioner to a street off of Greenfield, where Jackson obtained a bag from another man and gave it to the petitioner, who put it into the trunk of Gardner's car. The petitioner and Gardner ultimately took the cocaine to the petitioner's mother's house and put it into a car inside the garage. Gardner and the petitioner went to the petitioner's apartment, where the petitioner called Betty Louise Day in Muskegon. The petitioner and Gardner returned to the petitioner's mother's house and removed cocaine baggies that had been hidden inside of a car battery. The petitioner also broke the brick of cocaine that he had obtained from Jackson, cutting it and weighing it on a scale. The petitioner put the cocaine inside some pickle jars containing water and baking soda, before cooking it into crack cocaine. Thereafter, the cocaine was cut into little rocks and placed in bags. The following day, Gardner picked up the petitioner and took him to Aaron Banks' home, where "Twin", Lamont

Banks, Jeremiah, Sam, and Gerald Hill were. The petitioner took Gardner to a gas station, where the petitioner paid an attendant to place the cocaine inside of Gardner's spare tire. Gardner later drove the car to Muskegon, bringing Aaron Banks and "Twin" with him.

Gardner further testified that he helped the petitioner cook crack cocaine at Terrance Moore's condominium in Oak Park, Michigan and also helped the petitioner to cut crack cocaine at the petitioner's mother's house when "Mo/Kevin" brought the petitioner $15,000.

Cato Peterson testified that he grew up in the same neighborhood as the petitioner and also knew Anthony Johnson, Martese Wideman, Amir Wilson, and Dwayne Wynn. Peterson asked Aaron Banks and Wideman if he could accompany them to Muskegon to sell cocaine. Wideman told Peterson to obtain permission from the petitioner, who said that he did not care. On December 1, 1989, Peterson drove to Muskegon with Wideman, Wilson, and another person. The men went to Betty Louise Day's apartment. Peterson sold 50 rocks of cocaine that were given to him by Wideman.

On December 11, 1989, Peterson met the other men at Amir Wilson's house. The petitioner arrived in a Chevrolet Camaro and Ronald Gardner came in a white Mercury Cougar. Peterson and Wilson got into the Cougar with Gardner and followed the petitioner to a K-Mart store. Gardner and the petitioner went into the store and the petitioner subsequently exited the store carrying a bag. The men followed the petitioner to Aaron Banks' house. Peterson left with Banks, Wilson, and Gardner in the white Cougar. The men were eventually pulled over by the police in Muskegon.

Vicki Diggs testified that she first met the petitioner in Muskegon Heights. The petitioner offered to pay her money to let "the boys stay here and do their job," which meant selling crack

-4-

cocaine.  In April of 1989, the police raided Diggs' house and came up empty.  However, Diggs began holding cocaine and money in 1990 after meeting Anthony Johnson, a/k/a Tone.

Jeremiah Perry testified that he agreed to sell cocaine for the petitioner.  Perry lived with Aaron Banks in Detroit.  On one occasion, he saw the petitioner pay a man at an Amoco gas station to put the cocaine inside a spare tire.  Perry estimated that there was between $20,000 and $40,000 worth of cocaine in the tire.  Perry then drove Aaron Banks to Muskegon Heights, where the cocaine was sold.  Perry would bring back the money — between $20,000 and $40,000 —  five or six times a month and give it to the petitioner.  The petitioner would count the money with Perry and Aaron and Lamont Banks.

Perry also testified that he was with the petitioner when he purchased one-eighth of a kilogram (125 grams) of cocaine from Kevin Jackson.  On another occasion, Perry was with the petitioner when he purchased one kilogram from Jackson.  Perry and the petitioner cooked the cocaine several times at Terrance Moore's house, Perry's mother's house, and Anthony Johnson's house.  Perry testified that he knew Gerald Hill, who had wanted him to sell drugs.  Perry also knew Dwayne Wynn as another person who sold cocaine in Muskegon.  Perry and Wideman also sold cocaine for the petitioner in Lima, Ohio.

On November 14, 1995, the jury convicted the petitioner as charged.  He was sentenced to life in prison on December 14, 1995.

The petitioner attempted to file a direct appeal through an appointed lawyer, but somehow the ball was dropped.  Eventually, the state trial court remedied the inexplicable missteps of counsel and allowed a direct appeal to proceed in November 2004.   In May 2005, the trial court denied a motion for new trial, rejecting the contention that counsel was ineffective and that the conviction

-5-

facts were undermined by witness Jeremiah Perry's recanting affidavit. In March 2006, appellate counsel filed a two-issue brief raising those same arguments. The petitioner also filed a *pro se* supplemental brief, in which he raised claims that the trial court erred in admitting a police officer's in-court identification of the petitioner, the trial court improperly denied the petitioner's motion for a directed verdict, the prosecutor knowingly presented perjured testimony, and the petitioner was deprived of the effective assistance of counsel because he was denied a complete and accurate record on which to appeal. The petitioner's conviction was affirmed on appeal. *People v. Franklin,* No. 260959, 2006 WL 2987572, at *1-2 (Mich. Ct. App. October 19, 2006); *lv. den.* 477 Mich. 1056, 728 N.W.2d 417 (2007) (table).

The petitioner then filed a post-conviction motion for relief from judgment under Michigan Court Rule 6.502, in which he argued that there was insufficient evidence to support his conviction, the trial court erred by failing to instruct the jury on whether or not they could aggregate the amounts from the different drug transactions to reach 650 grams, the trial court erred by admitting evidence where the chain of custody had been broken, the prosecutor committed misconduct, and the petitioner was denied due process of law because of cumulative error. The trial court denied the motion for relief from judgment on August 21, 2007, and the Michigan appellate courts denied the petitioner's post-conviction appeal. *People v. Franklin,* No. 280365 (Mich. Ct. App. Apr. 3, 2008); *lv. den.* 483 Mich. 976, 764 N.W.2d 245 (2009) (table).

The petitioner now seeks a writ of habeas corpus on the following grounds:

I. The petitioner was denied the effective assistance of trial counsel when his counsel referenced a murder-for-hire plot that was suppressed by the court prior to trial.

II. The trial court erred by denying the petitioner's motion for a new trial based on Jeremiah Perry's affidavit that recanted a portion of his testimony.

-6-

III.  The trial court erred when it admitted an officer's in-court identification of the petitioner.

IV. The trial court erred by improperly denying the petitioner's motion for a directed verdict.

V. The prosecutor committed misconduct when he knowingly presented perjured testimony from a witness during trial.

VI.  The petitioner was denied his right to due process because he was denied a complete and accurate record for purposes of his appeal.

VII.   There was insufficient evidence presented to support the petitioner's conviction.

VIII.  The trial court erred by failing to instruct the jury on whether or not they were permitted to aggregate totals in order to reach 650 grams under the statute.

IX.  The trial court erred by admitting evidence where the chain of custody was broken.

X.   The prosecutor committed misconduct by mischaracterizing testimony, misstating the law so as to shift the burden of proof, and suggesting that the petitioner and his trial counsel were deliberately attempting to mislead the jury.

XI.  The petitioner was denied due process of law as a result of cumulative error.

XII.  The trial court erred in failing to apply the proper standard when it denied the petitioner's motion for relief from judgment.

## II.

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996), which govern this case, "circumscribe[d]" the standard of review federal courts must apply when considering an application for a writ of habeas corpus raising constitutional claims, including claims of ineffective assistance of counsel. *See Wiggins v. Smith*, 539 U.S. 510, 520 (2003).  As amended, 28 U.S.C. § 2254(d) permits a federal court to issue the writ only if the state court decision on a federal issue "was contrary to, or involved

an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or it amounted to "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2); *Franklin v. Francis*, 144 F.3d 429, 433 (6th Cir. 1998). Under that review standard, mere error by the state court does not justify issuance of the writ; rather, the state court's application of federal law "must have been objectively unreasonable." *Wiggins*, 539 U.S. at 520-21 (quoting *Williams v. Taylor*, 529 U.S. 362, 409 (2000) (internal quotes omitted)). Additionally, this Court must presume the correctness of state court factual determinations. 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct."); *see also West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996) (stating that "[t]he court gives complete deference to state court findings of historical fact unless they are clearly erroneous").

The Supreme Court has explained the proper application of the "contrary to" clause as follows:

> A state-court decision will certainly be contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases. . . .
>
> A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from [the Court's] precedent.

*Williams*, 529 U.S. at 405-06.

The Supreme Court has held that a federal court should analyze a claim for habeas corpus relief under the "unreasonable application" clause of § 2254(d)(1) "when a state-court decision unreasonably applies the law of this Court to the facts of a prisoner's case." *Id.* at 409. The Court

-8-

has explained that an unreasonable application of federal law is different from an incorrect application of federal law. Under that language, "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. The Supreme Court has continued to emphasize the limited nature of this review. In its recent unanimous decision in *Harrington v. Richter*, --- U.S. ---, 131 S. Ct. 770 (2011), the Court reiterated that the AEDPA requires federal habeas courts to review state court decisions with "deference and latitude," and "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Id.* at 786 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Sixth Circuit observed recently that "[t]his is a very high standard, which the [Supreme] Court freely acknowledges." *Peak v. Webb*, 673 F.3d 465, 472 (6th Cir. 2012). The *Peak* court suggested that *Richter* holds that the review standard "is even more constricted than AEDPA's plain language already suggests." *Ibid.*

The distinction between mere error and an objectively unreasonable application of Supreme Court precedent creates a substantially higher threshold for obtaining relief than *de novo* review. The AEDPA thus imposes a highly deferential standard for evaluating state-court rulings, and demands that state-court decisions be "given the benefit of the doubt." *Renico v. Lett*, --- U.S. ---, --- 130 S. Ct. 1855, 1862 (2010) (finding that the state court's rapid declaration of a mistrial on grounds of jury deadlock was not unreasonable even where "the jury only deliberated for four hours, its notes were arguably ambiguous, the trial judge's initial question to the foreperson was imprecise, and the judge neither asked for elaboration of the foreperson's answers nor took any other measures to confirm the foreperson's prediction that a unanimous verdict would not be reached" (internal

-9-

quotation marks and citations omitted)); *see also Peak*, 673 F.3d at 473-74; *Bray v. Andrews*, 640 F.3d 731, 737-39 (6th Cir. 2011); *Phillips v. Bradshaw*, 607 F.3d 199, 205 (6th Cir. 2010); *Murphy v. Ohio*, 551 F.3d 485, 493-94 (6th Cir. 2009); *Eady v. Morgan*, 515 F.3d 587, 594-95 (6th Cir. 2008); *Davis v. Coyle*, 475 F.3d 761, 766-67 (6th Cir. 2007); *King v. Bobby*, 433 F.3d 483, 489 (6th Cir. 2006); *Rockwell v. Yukins*, 341 F.3d 507, 511 (6th Cir. 2003) (en banc).  Moreover, habeas review is "limited to the record that was before the state court." *Cullen v. Pinholster*, --- U.S. ---, 131 S. Ct. 1388, 1398 (2011).

## A.

As an initial matter, the respondent contends that the petitioner's fourth, fifth, and seventh through eleventh claims are procedurally defaulted for various reasons.  This Court notes that procedural default is not a jurisdictional bar to a review of the merits of an issue, *See Howard v. Bouchard*, 405 F.3d 459, 476 (6th Cir. 2005), and "federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits." *Hudson v. Jones*, 351 F.3d 212, 215 (6th Cir. 2003) (*citing Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)).  Application of a procedural bar would not affect the outcome of this case, and the Court deems it more efficient in this case to proceed directly to the merits.

## B.

The petitioner contends that he was deprived of the effective assistance of trial counsel because of a misbegotten cross-examination strategy of a state witness that revealed information about a murder-for-hire plot that the trial court had suppressed.  The petitioner also argues that his appellate lawyer was incompetent because he did not raise on direct appeal the issues the petitioner presented in his post-conviction motion.

The two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), governs the Court's analysis of ineffective-assistance-of-counsel claims. *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005). "To establish ineffective assistance of counsel 'a defendant must show both deficient performance by counsel and prejudice.'" *Premo v. Moore*, --- U.S. ---, ---, 131 S. Ct. 733, 739 (2011) (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009)).

Because of the high deference accorded state court determinations by AEDPA, establishing that counsel was ineffective and, therefore, the petitioner was denied his right to counsel under the Sixth Amendment is difficult. The Supreme Court explained recently:

> "Surmounting *Strickland's* high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. ---, ---, 130 S. Ct. 1473, 1485 (2010). . . . The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. *Strickland*, 466 U.S. at 690.
>
> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id.*, at 689; *Lindh v. Murphy*, 521 U.S. 320, 333, n.7 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles*, 556 U.S., at 123. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. *Ibid.* Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Harrington*, 131 S. Ct. at 788.

On habeas review, "[t]he question 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable — a substantially higher threshold.'" *Knowles*, 556 U.S. at 123 (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)). Moreover, "because the *Strickland* standard is a general

standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Ibid.* (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

The petitioner's criticism of trial counsel focuses on his cross-examination of Andrew Bernard. Bernard connected the petitioner to drug trafficking in the Muskegon region via an association with Terrence Moore. Defense counsel sought to explore a deal Bernard made with the Muskegon County prosecutor to cooperate with the state, and in response to a question, Bernard volunteered that part of the consideration was an agreement not to prosecute him for conspiracy to commit murder. That reference was to a charge involving a plot to kill the Muskegon prosecutor, which defense counsel had successfully excluded from the trial.

When the petitioner's appellate counsel raised this claim in a motion for a new trial, the trial court rejected it, ruling that it was Bernard who had volunteered that information on cross-examination and was permitted to expound on the information on redirect examination over trial counsel's repeated objection. *People v. Franklin,* No. 94-131215-FC, *3 (Oakland Cnty. Cir. Ct., Feb. 16, 2006). The Michigan Court of Appeals concluded that it was not unreasonable for defense counsel to cross-examine Bernard about when he became a prosecution witness and whether prosecutors in Muskegon County had offered him a deal to testify. That court noted further that although the prosecutor was permitted on redirect examination to elicit some details about the conspiracy to commit murder, there was no suggestion from Bernard's testimony that the petitioner was involved in the murder plot. *Franklin,* 2006 WL 2987572, at *3. Citing *Strickland*, among other cases, the court held that trial counsel's performance was not deficient and the petitioner was not prejudiced by counsel's actions.

The Michigan Court of Appeals' decision did not unreasonably apply federal law. Counsel's performance in cross-examining Andrew Bernard about the plea deal that he received to testify against the petitioner amounted to reasonable trial strategy. On such matters, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (internal citations and quotations omitted). The petitioner has not overcome that presumption here. Defense counsel's questions appear to have been part of a legitimate strategy to cast doubt on Bernard's credibility. *See Campbell v. United States*, 364 F.3d 727, 734-35 (6th Cir. 2004). Moreover, because Bernard did not suggest that the petitioner was a part of this murder-for-hire plot, the petitioner is unable to show that he was prejudiced by the admission of this evidence. The petitioner is not entitled to habeas relief on his first claim.

The petitioner's seventh through eleventh claims allege insufficiency of evidence and various trial errors. None of those claims were raised on direct appeal, and the petitioner contends that he was constructively denied the effective assistance of appellate counsel because his appellate lawyer did not raise them. The petitioner argues that such failure amounts to a structural error, although it is not clear that the petitioner intends to raise that argument as an independent claim, as opposed to an argument that excuses procedural default. The Court will assume the former.

The Supreme Court has held that the "[a]ctual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice." *Strickland*, 466 U.S. at 692. The three recognized instances in which the presumption of prejudice can arise are "(1) when the accused is denied the presence of counsel at a critical stage, resulting in the complete denial of counsel; (2)

-13-

when counsel does not subject the prosecution's case to any meaningful adversarial testing; and (3) when counsel is placed in circumstances in which competent counsel very likely would be unable to render effective assistance." *Henness v. Bagley*, 644 F.3d 308, 323 (6th Cir. 2011) ( citing *Bell v. Cone,* 535 U.S. 685, 695-96 (2002)).   It appears that the petitioner is relying on the second instance.   In such cases, for a presumption of prejudice to arise, the attorney's failure to test the prosecutor's case "must be complete." *Bell,* 535 U.S. at 697.   The presumption of prejudice extends to the denial of counsel on appeal.   *Penson v. Ohio*, 488 U.S. 75, 88 (1988).   However, a case in which a defendant is denied counsel on appeal "is unlike a case in which counsel fails to press a particular argument on appeal . . . or fails to argue an issue as effectively as he or she might." *Id.* at 88 (internal citation omitted).   Although the denial of counsel altogether on appeal warrants a presumption of prejudice, mere ineffective assistance of counsel on appeal does not. *Smith v. Robbins,* 528 U.S. 259, 286 (2000).

In the present case, the petitioner's appellate counsel filed an eighteen page brief on appeal that raised the first two claims that the petitioner has presented in his habeas application.   Appellate counsel also filed a motion for a new trial or an evidentiary hearing.   Because appellate counsel actually filed an appellate brief on the petitioner's behalf, he did not fail to "subject the prosecution's case to any meaningful adversarial testing," and therefore, there is no structural error. The presumption of prejudice does not apply.

Moreover, the petitioner is unable to show that appellate counsel was ineffective by failing to raise his seventh through eleventh claims on direct appeal.   It is well-established that a criminal defendant does not have a constitutional right to have appellate counsel raise every non-frivolous issue on appeal. *See Jones v. Barnes*, 463 U.S. 745, 751 (1983).   And "appellate counsel cannot be

-14-

found to be ineffective for 'failure to raise an issue that lacks merit.'" *Shaneberger v. Jones*, 615 F.3d 448, 452 (6th Cir. 2010) (quoting *Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001)).  As explained below, none of those claims have any merit; therefore, appellate counsel was not ineffective by failing to raise them on the petitioner's direct appeal.

C.

In his second claim, the petitioner argues that the state trial court abused its discretion when it found that the recanting affidavit of Jeremiah Perry did not require a new trial.  Perry's "affidavit" (which was not made under oath) states that he was coerced into testifying falsely at the trial of a co-conspirator, Kevin Andreas Jackson.  Perry's sister, April Jackson, also signed an affidavit claiming that Perry testified falsely at Jackson's trial.

Recanting affidavits and witnesses are viewed with "extreme suspicion." *United States v. Chambers*, 944 F.2d 1253, 1264 (6th Cir. 1991); *See also Byrd v. Collins,* 209 F.3d 486, 508 n.16 (6th Cir. 2000).  A court "may consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence." *Schlup v. Delo,* 513 U.S. 298, 332 (1995).

Jeremiah Perry did not sign his recanting affidavit until August 2, 2002, which was almost seven years after the petitioner's conviction and over nine years after Jackson's trial.  The affidavit does not offer any convincing explanation why Perry waited so long to recant his testimony.  There was nothing unreasonable in the state court's rejection of the recantation.  *See Lewis v. Smith,* 100 F. App'x 351, 355 (6th Cir. 2004) (holding that it was proper for the district court to reject as suspicious a witness's recanting affidavit made two years after the petitioner's trial); *Strayhorn v. Booker*, 718 F. Supp. 2d 846, 874 (E.D. Mich. 2010) (finding that a long-delayed affidavit of an

-15-

accomplice recanting a statement to police did not establish the petitioner's actual innocence where it was made almost two years after petitioner's trial). Moreover, the purported affidavit from Perry was not made under oath. An unsworn affidavit from a recanting witness is of questionable validity. *See Cress v. Palmer,* 484 F.3d 844, 855 (6th Cir. 2007) (rejecting an actual innocence claim that was based in part on an unsworn statement from a recanting witness). The Michigan courts' rejection of the petitioner's second claim does not entitle the petitioner to habeas relief.

D.

In his third claim, the petitioner challenges the trial court's refusal to suppress Southfield Police Sergeant Paul Bourlier's in-court identification of the petitioner on the ground that it was the result of a suggestive pretrial identification procedure.

Sergeant Bourlier testified that he arrested Gerald Hill on July 5, 1990 in connection with crack cocaine seized from behind an auto parts store. Sergeant Bourlier testified that the petitioner and Hill were passengers in a vehicle driven by Wideman. Bourlier checked Wideman and the petitioner for weapons and outstanding warrants before releasing them. Bourlier subsequently observed the petitioner and Wideman briefly return to the area after they had been released. Bourlier testified that about one month later on August 8, 1990, a preliminary hearing was conducted for Hill, after which Bourlier observed the petitioner drive away from the courthouse in a vehicle. Bourlier testified that he recalled seeing a photograph of the petitioner two or three years prior to the petitioner's trial and that it "may have" assisted him in making an identification of the petitioner. At that point, defense counsel moved to strike Sergeant Bourlier's testimony. The trial court denied the motion. Thereafter, Bourlier testified that the petitioner provided his name, birth date, height, weight, eye color, hair color, and an address during the traffic stop. Sergeant Bourlier indicated that

-16-

an assistant prosecutor pointed out the vehicle and told him that he believed that it was occupied by the petitioner at the time of Hill's preliminary examination.

The petitioner raised this claim on direct appeal; the court of appeals rejected it for two reasons. First, the court found that there was no evidence that Sergeant Bourlier viewed the photograph or was directed to the vehicle at Hill's preliminary examination as part of any identification procedure. *Franklin,* 2006 WL 2987572, at *6. Second, the court stated that "the circumstances described in Sergeant Bourlier's testimony reflect an alert officer who had an opportunity to observe defendant during a traffic stop and to obtain information directly from defendant regarding his identity." *Id.* at *7.

It is true that the Due Process Clause protects an accused person against the introduction of evidence that results from an unreliable identification obtained through unnecessarily suggestive procedures. *Moore v. Illinois*, 434 U.S. 220, 227 (1977). However, to determine whether an identification procedure violates due process, courts look first to whether the procedure was impermissibly suggestive, and then decide whether, under the totality of circumstances, the suggestiveness led to a substantial likelihood of an irreparable misidentification. *Neil v. Biggers*, 409 U.S. 188 (1972).

A criminal defendant has the initial burden of proving that the identification procedure was impermissibly suggestive; the burden then shifts to the prosecutor to prove that the identification was reliable despite the suggestive identification procedure. *See United States v. Wade*, 388 U.S. 218, 240 n.31 (1967). The factors bearing on the latter determination include (1) the witness's opportunity to view the criminal at the time of the crime; (2) the witness's degree of attention at the time of the crime; (3) the accuracy of the witness's prior description of the defendant; (4) the

-17-

witness's level of certainty when identifying the suspect at the confrontation; and (5) the length of time that has elapsed between the time and the confrontation. *Neil*, 409 U.S. at 199-200. If a defendant fails to show that the identification procedures were impermissibly suggestive, or if the totality of the circumstances indicates that the identification is otherwise reliable, no due process violation has occurred. As long as there is not a substantial likelihood of misidentification, it is for the jury to determine the ultimate weight to be given to the identification. *United States v. Hill*, 967 F.2d 226, 230 (6th Cir.1992).

Here, the petitioner has not shown that Sergeant Bourlier's identification was unreliable or that there was a substantial likelihood of misidentification. As the Michigan Court of Appeals indicated, Sergeant Bourlier was a trained police officer who had an ample opportunity to observe the petitioner during the traffic stop and who obtained identification information from the petitioner. Although showing only one photograph of the petitioner to Sergeant Bourlier may have been suggestive, there was no substantial likelihood of irreparable misidentification where the identification was made by a trained police officer who had a sufficient opportunity to view the petitioner during daylight hours and accurately described him. *See Manson v. Brathwaite,* 432 U.S. 98, 115 (1977); *United States v. Obiukwu,* 17 F.3d 816, 820 n.1 (6th Cir. 1994). Sergeant Bourlier's in-court identification was bolstered by the fact that the officer had obtained from the petitioner his name, birth date, height, weight, eye color, hair color, and an address. Moreover, in light of the substantial evidence against the petitioner in this case, Sergeant Bourlier's in-court identification was probably inconsequential; it would not have affected the outcome of the case. *See Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

The petitioner also contends that Vicky Diggs' identification testimony was suspect because she was shown photographs of the petitioner and co-defendant Anthony Johnson in 1992 and 1993 as part of a packet of 47 pictures.  According to Diggs, five or six of the photographs looked alike, although only two of the pictures were of the petitioner.  Diggs insisted, however, that she did not need a photograph to remember the petitioner.

The Michigan Court of Appeals refused to address the petitioner's claim, finding it to be abandoned because the petitioner had failed to include it in his statement of questions presented in his brief.  The court of appeals also noted that defense counsel did not object to the prosecutor's redirect examination of Diggs concerning the photographs.  *Franklin,* 2006 WL 2987572, at *7.

Diggs's identification testimony is no basis for habeas relief.  Even if the identification procedure was somehow suggestive, the petitioner has not shown that Diggs lacked an independent basis for her in-court identification.  Diggs had met the petitioner several times and stated at trial that she did not need a photograph to identify him.

## D.

In the seventh claim, the petitioner argues that the evidence was not sufficient to prove that he was accountable for the distribution of 650 or more grams of cocaine.  In his fourth claim, he contends that the trial court did not use the proper standard of review as set out in Michigan Court Rule 6.419(D) when denying his motion for a directed verdict.

The fourth claim can be dispatched quickly.  Rule 6.419(D) requires trial judges in Michigan who grant post-verdict judgments of acquittal to indicate whether they would grant a new trial if the judgment of acquittal is reversed later on appeal.  The rule has no relevance here, since the trial judge denied the petitioner's post-trial motion for acquittal.  Moreover, the claim involves an error

-19-

of state law, which is not cognizable by a federal habeas court. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *King v. Trippett*, 27 F. App'x 506, 510 (6th Cir. 2001).

The question of sufficiency of evidence, however, does raise a federal constitutional concern. "[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). The critical inquiry on habeas review of the sufficiency of the evidence to support a criminal conviction is

> whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt . . . . [T]his inquiry does not require a court to "ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt." Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979) (internal citation and footnote omitted). In the habeas context, "[t]he *Jackson* standard must be applied 'with explicit reference to the substantive elements of the criminal offense as defined by state law.'" *Brown v. Palmer*, 441 F.3d 347, 351 (6th Cir. 2006) (quoting *Jackson*, 443 U.S. at 324 n.16). "A reviewing court does not reweigh the evidence or redetermine the credibility of the witnesses whose demeanor has been observed by the trial court." *Matthews v. Abramajtys*, 319 F.3d 780, 788 (6th Cir. 2003) (citing *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983)). A habeas court must defer to the fact finder for its assessment of the credibility of witnesses. *Id.* at 788. "[A] reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume — even if it does not affirmatively appear in the record — that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *McDaniel v. Brown*, --- U.S. ---, ---, 130 S. Ct. 665, 673 (2010) (citations omitted). Accordingly, "[t]he mere existence of sufficient evidence to convict . . . defeats

-20-

a petitioner's claim." *Id.* at 788-89.  The Court does not need to be convinced that the petitioner is actually guilty beyond a reasonable doubt.  *Walker v. Russell*, 57 F.3d 472, 475 (6th Cir.1995).

"Two layers of deference apply to habeas claims challenging evidentiary sufficiency." *McGuire v. Ohio*, 619 F.3d 623, 631 (6th Cir. 2010) (citing *Brown v. Konteh*, 567 F.3d 191, 204-05 (6th Cir. 2009)).  First, the Court "must determine whether, viewing the trial testimony and exhibits in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Brown*, 567 F.3d at 205 (citing *Jackson*, 443 U.S. at 319).  Second, if the Court were "to conclude that a rational trier of fact could not have found a petitioner guilty beyond a reasonable doubt, on habeas review, [the Court] must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable." *Ibid.*

Under Michigan law, conspiracy is an agreement between two or more persons to commit an unlawful or criminal act. *People v. Weathersby*, 204 Mich. App. 98; 111; 514 N.W.2d 493 (1994). Because conspiracy is a specific intent crime, it requires both an intent to combine with others and the intent to accomplish the illegal objective. *People v. Carter*, 415 Mich. 558, 568; 330 N.W.2d 314 (1982).  Direct proof of an agreement is not required, nor is proof of a formal agreement necessary. Rather, it is sufficient that the circumstances, acts, and conduct of the parties establish an agreement. *People v. Cotton*, 191 Mich. App. 377, 393; 478 N.W.2d 681 (1991).  A conspiracy may be proven by circumstantial evidence or may be based on inference. *Id.*

The elements of conspiracy to deliver controlled substances are:

(1) the defendant possessed the specific intent to deliver the statutory minimum as charged,
(2) his coconspirators possessed the specific intent to deliver the statutory minimum as charged, and
(3) the defendant and his coconspirators possessed the specific intent to combine to deliver the statutory minimum as charged to a third person.

-21-

*People v. Justice (After Remand)*, 454 Mich. 334, 349; 562 N.W.2d 652 (1997).

Under Michigan law, multiple deliveries of small amounts of drugs may be aggregated to reach the necessary quantities where the conduct is shown to be part of a single scheme or plan to deliver the larger amount of narcotics charged. *People v. Porterfield*, 128 Mich. App. 35, 41, 339 N.W.2d 683, 686-87 (1983).

In the present case, the evidence allowed the jury rationally to conclude that the petitioner conspired with others to deliver over 650 grams of cocaine. According to the trial record, on December 11, 1989, the petitioner and Aaron Banks placed 222.052 grams of cocaine into 23 baggies, which they then concealed in a hot plate and placed in a car. Ronald Gardner, Jr. then drove the car to the Muskegon area to sell the drugs. Gardner had been called by the petitioner from Martese Wideman's house to ask him to accompany him to the K-Mart store to purchase the hot plate. Gardner testified that previously he had accompanied several men, including Gerald Hill, to Muskegon to sell cocaine. Jeremiah Perry testified that he transported between $20,000 and $40,000 worth of cocaine to Muskegon on several occasions at the petitioner's request. Perry was with the petitioner on one occasion when he purchased 125 grams of cocaine from Kevin Jackson. Perry testified that he was present with the petitioner on another occasion when the petitioner purchased one kilogram of cocaine from Jackson for $17,000. Perry testified that he and Wideman sold cocaine for the petitioner in Lima, Ohio. Gardner and Perry testified that they helped the petitioner cook crack cocaine several times at various locations. The petitioner was present with Gerald Hill and Martese Wideman in Southfield, Michigan on July 5, 1990 when Hill was arrested in possession of 389.64 grams of cocaine. The evidence established that Wideman and Hill had also been involved in transporting cocaine to Muskegon for the petitioner; therefore the jury reasonably could

-22-

have inferred that the 389.64 grams of cocaine that was seized from Gerald Hill was part of the conspiracy.

From the evidence presented, a rational trier of fact could conclude beyond a reasonable doubt that the petitioner and the others were part of a single plan to deliver more than 650 grams of cocaine. Indeed, Jeremiah Perry testified that on one occasion alone, the petitioner purchased 1,000 grams of cocaine from Kevin Jackson. The additional cocaine transactions mentioned above total over 736 grams of cocaine. There is no doubt that the evidence was constitutionally adequate to support the petitioner's conviction.

E.

The petitioner's fifth and tenth claims allege prosecutorial misconduct. It is well established that prosecutors must "'refrain from improper methods calculated to produce a wrongful conviction.'" *United States v. Young*, 470 U.S. 1, 7 (1985) (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)). However, "[c]laims of prosecutorial misconduct are reviewed deferentially on habeas review." *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004) (citing *Bowling v. Parker*, 344 F.3d 487, 512 (6th Cir. 2003)). Prosecutorial misconduct will form the basis for a new trial and habeas relief only if the alleged misconduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). "To constitute a denial of due process, the misconduct must be 'so pronounced and persistent that it permeates the entire atmosphere of the trial.'" *Byrd v. Collins*, 209 F.3d 486, 529-30 (6th Cir. 2000) (quoting *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997)). "The Court must examine 'the fairness of the trial,

not the culpability of the prosecutor.'" *Pritchett*, 117 F.3d at 964 (quoting *Serra v. Michigan Dep't of Corrs.*, 4 F.3d 1348, 1355 (6th Cir. 1993)).

When assessing such a claim, the Court first considers whether the prosecutor's conduct or remarks were improper. *Slagle v. Bagley*, 457 F.3d 501, 515-16 (6th Cir. 2006). If they were, the Court then must decide whether the improper acts were so flagrant as to warrant relief. *Id.* at 516. The Sixth Circuit applies a four-factor test to any inappropriate prosecutorial conduct to determine whether it was flagrant: "(1) whether the evidence against the defendant was strong, (2) whether the conduct of the prosecution tended to mislead the jury or prejudice the defendant; (3) whether the conduct or remarks were isolated or extensive; and (4) whether the remarks were made deliberately or accidentally." *Id.* (citation omitted). But as with all habeas claims, federal courts do not apply these factors to an empty canvas. "The Supreme Court has clearly indicated that the state courts have substantial breathing room when considering prosecutorial misconduct claims because 'constitutional line drawing [in prosecutorial misconduct cases] is necessarily imprecise.'" *Slagle v. Bagley*, 457 F.3d 501, 516 (6th Cir. 2006) (*quoting Donnelly*, 416 U.S. at 645).

In his fifth claim, the petitioner alleges that the prosecutor knowingly introduced perjured testimony by manipulating Sergeant Bourlier into testifying falsely regarding his identification of the petitioner. If that were true, a constitutional violation likely would have occurred, since prosecutors may not knowingly use perjured testimony, *Giglio v. United States*, 405 U.S. 150, 153 (1972), nor may they allow false evidence or testimony to go uncorrected, *Napue v. Illinois*, 360 U.S. 264, 269 (1959) (internal citations omitted). To prevail on a claim that a conviction was obtained with false evidence, the petitioner must show that the statements were actually false, that the statements were material, and that the prosecutor knew they were false. *Coe v. Bell*, 161 F.3d

-24-

320, 343 (6th Cir. 1998). However, a misleading statement will not satisfy that burden. Instead, a habeas petitioner must show that a witness's statement was "indisputably false." *Byrd v. Collins*, 209 F.3d at 517-18.

In the present case, the petitioner has presented only his conclusory allegations that Sergeant Bourlier testified falsely about his ability to remember the petitioner from the July 5, 1990 traffic stop. Conclusory allegations without any evidentiary support do not provide a basis for habeas relief. *Washington v. Renico,* 455 F.3d 722, 733 (6th Cir. 2006) (bald assertions and conclusory allegations do not provide sufficient ground to warrant requiring an evidentiary hearing in a habeas proceeding); *Workman v. Bell,* 160 F.3d 276, 287 (6th Cir. 1998) (conclusory allegations of ineffective assistance of appellate counsel do not warrant habeas relief). Because the petitioner's perjury claim is unsupported, he is not entitled to habeas relief.

In his tenth claim, the petitioner claims that the prosecutor committed misconduct during closing argument by mischaracterizing testimony when he mentioned that the petitioner was in court as a result of his arrest some three or four years after his indictment, "after having been involved in a drug related shooting." Tr. at 35 (Nov. 14, 1995). The petitioner contends that the argument was improper because it implied that the petitioner took part in the shooting, when he was merely with a friend who got shot during a marijuana transaction.

It is improper for a prosecutor to present to the jury any facts that have not been introduced into evidence. *Byrd*, 209 F.3d at 535. But where, as here, the evidence is strong and the remark is isolated, a petitioner will not be entitled to habeas relief. *Macias v. Makowski,* 291 F.3d 447, 453-54 (6th Cir. 2002); *Byrd,* 209 F.3d at 536. If the prosecutor committed misconduct in this case, the flaw

was ameliorated by the trial court's instruction that the lawyers' comments and statements were not evidence. *Hamblin v. Mitchell,* 354 F.3d 482, 495 (6th Cir. 2003).

The petitioner also argues that the prosecutor overstated the quantity of drugs involved in this case when he asserted that 399 grams of cocaine had been taken from Gerald Hill, instead of 389.64 grams. The mistake, however, was inconsequential, especially in light of evidence of a 1,000 gram transaction that well exceeded the statutory threshold.

The petitioner next contends that the prosecutor shifted the burden of proof and commented on the petitioner's right not to testify when he stated that the petitioner "cannot explain a fingerprint on a hotplate." Tr. at 36 (Nov. 14, 1995). The remark was unfortunate, but it did not deprive the petitioner of a fair trial, because any possible prejudice that might have resulted from the comment was cured by the trial court's instruction about the proper burden of proof and that the petitioner did not have to prove his innocence. *See Scott v. Elo,* 302 F.3d 598, 603-04 (6th Cir. 2002).

Nor is the petitioner entitled to relief on his related claim that the prosecutor improperly commented on his right to remain silent. The prosecutor did not mention the petitioner's silence. Rather, at most, the remark might be construed as a reference to the petitioner's failure to present evidence. But when a prosecutor's statement indirectly comments on a habeas petitioner's decision not to testify, federal courts consider four factors to evaluate such a statement: "1) Were the comments 'manifestly intended' to reflect on the accused's silence or of such a character that the jury would 'naturally and necessarily' take them as such; 2) were the remarks isolated or extensive; 3) was the evidence of guilt otherwise overwhelming; 4) what curative instructions were given and when." *Bowling,* 344 F.3d at 514 (quoting *Lent v. Wells*, 861 F.2d 972, 975 (6th Cir. 1988))

-26-

The prosecutor's remark in the present case was isolated.  Moreover, the petitioner's counsel objected on the ground that the petitioner was "not under any obligation whatsoever to explain anything." Tr. at 36 (Nov. 14, 1995).  The trial court sustained the objection and informed the jury that "the Defendant need say nothing." *Ibid.*  That curative instruction ameliorated any damage from the prosecutor's brief remark.  Lastly, the evidence against the petitioner in this case was overwhelming.  The petitioner is not entitled to habeas relief on the basis of the prosecutor's remark.

The petitioner contends that the prosecutor suggested in his rebuttal argument that defense counsel and the petitioner were attempting to mislead the jury.  The petitioner first points to the prosecutor's comment that his job was to read to the jury the indictment and the evidence, "unlike Mr. Curtis' [the defense counsel's] job. Tr. at 61 (Nov. 14, 1995). "[A] prosecutor commenting that the defense is attempting to trick the jury is a permissible means of arguing so long as those comments are not overly excessive or do not impair the search for the truth." *United States v. August*, 984 F.2d 705, 715 (6th Cir. 1992).  Assuming that the prosecutor's comment could be construed as a suggestion that defense counsel was misleading the jury, the petitioner would not be entitled to habeas relief because the remark was isolated and the evidence against the petitioner was strong.

The petitioner argues that the prosecutor implied that the petitioner was attempting to mislead the jury when he commented that the petitioner had shaved his head at the beginning of the trial.  Even if the prosecutor improperly commented on the petitioner's character, such misconduct was harmless in light of the overwhelming evidence of guilt against petitioner in this case. *Cristini v. McKee,* 526 F.3d 888, 900-01 (6th Cir. 2008).  The petitioner is not entitled to habeas relief on his fifth and tenth claims.

F.

In his sixth claim, the petitioner argues that he was denied due process because the trial transcripts are inconsistent with the videotapes of the trial.  The Sixth Circuit has held that "federal habeas relief based on a missing transcript will only be granted where the petitioner can show prejudice." *See Scott v. Elo*, 302 F.3d at 604 (citing *Bransford v. Brown*, 806 F.2d 83, 86 (6th Cir. 1986)).  Although the Sixth Circuit has recognized the difficulty in demonstrating prejudice where the transcripts are missing, a habeas petitioner must nonetheless "present something more than gross speculation that the transcripts were requisite to a fair appeal." *See Bransford,* 806 F.2d at 86.

The Michigan Court of Appeals rejected the petitioner's claim, noting that the petitioner's appellate counsel relied on a statement prepared by the petitioner to summarize the alleged inaccuracies without verifying whether there were inconsistencies between the transcripts and the videotapes of the trial.  *Franklin,* 2006 WL 2987572, at *8-9.  Furthermore, the petitioner's own statement did not detail the specific testimony in the transcript pages that allegedly was changed, nor did it indicate that the petitioner had ever viewed the videotapes to determine any inaccuracies. At most, the petitioner appears to allege that a defense objection to jury instructions was inaccurately transcribed and that although the trial transcripts reflect that the date of the traffic stop by Sergeant Bourlier occurred on July 5, 1990, the prosecution witnesses had testified falsely that the traffic stop occurred on July 5, 1989.  Assuming that those two parts of the trial were incorrectly transcribed, the petitioner has presented no argument that he was prejudiced by the errors.  The petitioner is not entitled to habeas relief on his sixth claim.

G.

-28-

In his eighth claim, the petitioner contends that he was deprived of a fair trial when the court failed to instruct the jurors that they could aggregate the amounts of the individual drug transactions to reach the charged amount of over 650 grams only if they could find that each of the transactions were part of a single scheme or plan. There is no error here. The instruction appears to be consistent with state law. See *People v. Porterfield*, 128 Mich. App. 35, 41, 339 N.W.2d 683 (1983). Moreover the jury could have convicted the petitioner of the charged crime irrespective of the challenged instruction on the testimony of Jeremiah Perry, who said that the petitioner purchased a kilogram of cocaine from Kevin Jackson on one occasion.

H.

In his ninth claim, the petitioner contends that some of the evidence should not have been admitted in this case because of a break in the chain of custody. That claim is not cognizable on habeas review because it challenges the improper admission of evidence under state law. Federal habeas courts "'must defer to a state court's interpretation of its own rules of evidence and procedure' when assessing a habeas petition." *Miskel v. Karnes*, 397 F.3d 446, 453 (6th Cir. 2005) (quoting *Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988)). Moreover, a break in the chain of custody generally goes to the weight of the evidence, not its admissibility. *United States v. Allen*, 619 F.3d 518, 525 (6th Cir. 2010)*; People v. White*, 208 Mich. App. 126, 130-31, 527 N.W.2d 34, 37 (1994). The petitioner is not entitled to habeas relief on his ninth claim.

*I.*

In his eleventh claim, the petitioner contends that he is entitled to habeas relief because of cumulative error. The Court disagrees. The cumulative weight of alleged constitutional trial errors in a state prosecution does not warrant federal habeas relief, because there is no clearly established

-29-

federal law permitting or requiring the cumulation of distinct constitutional claims to grant habeas relief. *Moore v. Parker,* 425 F.3d 250, 256 (6th Cir. 2005). Therefore, the petitioner is not entitled to habeas relief on the grounds of cumulative error.

## J.

In his twelfth and final claim, the petitioner claims that the trial court failed to apply the proper standard of review when adjudicating the petitioner' post-conviction motion for relief from judgment. A writ of habeas corpus cannot be granted on that ground. "The Sixth Circuit has consistently held that errors in post-conviction proceedings are outside the scope of federal habeas corpus review." *Cress*, 484 F.3d at 853. Challenges to state collateral post-conviction proceedings "cannot be brought under the federal habeas corpus provision, 28 U.S.C. § 2254," because " 'the essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and . . . the traditional function of the writ is to secure release from illegal custody.'" *Kirby v. Dutton*, 794 F.2d 245, 246 (6th Cir. 1986) (quoting *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973)). "A due process claim related to collateral post-conviction proceedings, even if resolved in a petitioner's favor, would not 'result [in] . . . release or a reduction in . . . time to be served or in any other way affect his detention because we would not be reviewing any matter directly pertaining to his detention.'" *Cress,* 484 F.3d at 853 (quoting *Kirby*, 794 F.2d at 247). Thus, the "'scope of the writ'" does not encompass a "'second tier of complaints about deficiencies in state post-conviction proceedings.'" *Ibid.* (quoting *Kirby*, 794 F.2d at 248). "[T]he writ is not the proper means to challenge collateral matters as opposed to the underlying state conviction giving rise to the prisoner's incarceration." *Ibid.* (internal quotations omitted). The petitioner is not entitled to habeas relief on his twelfth claim.

-30-

III.

The state court decisions in this case were not contrary to federal law, an unreasonable application of federal law, or an unreasonable determination of the facts.  The petitioner has not established that he is presently in custody in violation of the Constitution or laws of the United States.

Accordingly, it is **ORDERED** that the petition for a writ of habeas corpus is **DENIED.**

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:  November 19, 2012

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on November 19, 2012.

s/Deborah R. Tofil
DEBORAH R. TOFIL